IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Brian Patton and Jennifer Patton, on behalf of themselves and all others similarly situated | : : : | Case No. 1:06-CV-010 |
| Plaintiffs, | : | District Judge Susan J. Dlott |
| v. | : : | ORDER GRANTING PLAINTIFFS' |
| Jeff Wyler Eastgate, Inc., | : : | MOTION FOR SUMMARY JUDGMENT ON LIABILITY |
| Defendant. | : | |

This matter is before the Court on Plaintiffs' Motion for Summary Judgment on Liability (doc. 17). Plaintiffs have sued the defendant, an automobile dealership, for violations of the Truth in Lending Act and civil conversion after the dealership rescinded their contract for the purchase of a used automobile. The Court heard oral argument on Plaintiffs' motion on March 1, 2007. For the following reasons, the Court hereby **GRANTS** Plaintiffs' motion as to Count I of the Complaint and also **DISMISSES** Count II of the Complaint.

**I.     FACTS**

This case arises from Plaintiffs Brian and Jennifer Patton's purchase, or attempted purchase, of a used automobile from Defendant Jeff Wyler Eastgate, Inc. ("Wyler Eastgate"). On November 10, 2005, the Pattons visited Wyler Eastgate and entered into a transaction to purchase a used 2003 Ford Windstar minivan. The Pattons intended to use the vehicle primarily for personal, family, or household purposes.

As part of their transaction, the parties each signed a Retail Installment Sale Contract ("the Installment Contract"). The Pattons were expressly identified as the "Buyer (and Co-

1

Buyer)" and Wyler Eastgate was expressly identified as the "Creditor-Seller" in the Installment Contract. An entity called "Consumer Portfolio Services" was identified as the "other owner" which was defined in the Installment Contract as "a person whose name is on the on the title to the vehicle but does not have to pay the debt." The Installment Contract listed the financial terms of the transaction in a section entitled "Federal Truth in Lending Disclosures" as follows: 19.95% annual percentage rate ("APR"), $10971.10 finance charge, $18,664.70 total financed, $29,635.80 in total payments, 60 payments of $493.93 required, and $31,365.80 total sale price. Under the terms of the Installment Contract, the Pattons agreed to pay the "Creditor-Seller . . . the Amount Financed and Finance Charge according to the payment schedule" stated therein.

The Installment Contract also contained a "No Cooling Off Period" section which read as follows:

> State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. . . .

Finally, the Installment Contract contained a merger clause which stated in relevant part:

> HOW THIS CONTRACT CAN BE CHANGED. This contract is the entire agreement between you and us relating to this contract. Any change in this contract must be in writing and we must sign it. No oral changes are binding.

The Installment Contract was signed by Wyler Eastgate as Seller and by the Pattons as the Buyer and Co-Buyer.

The parties also signed a "Purchase Spot Delivery Agreement" as part of the transaction. The Purchase Spot Delivery Agreement stated in relevant part as follows:

> The Dealership is permitting you to take possession of the above listed vehicle prior to financing approval being obtained. This is known as "Spot

2

> Delivery." Although you are being permitted to take possession of the above listed vehicle, you understand that financing for your purchase has not been finalized. You and the Dealership intend that financing will be obtained either directly from a third party or the Dealership will assign to a third party the Retail Installment Contract that you signed to complete the purchase transaction.
> In the event the Dealership is unable to obtain third party financing approval or, if applicable, assign the Retail Installment sales Contract to a third party within 45 days of the above listed date, you shall immediately, upon being notified by the Dealership, return the vehicle or pay the Dealership the balance due as reflected in the Retail Buyers Order. * * * *
> This Purchase Spot Delivery Agreement is to be made part of the Retail Buyers Order for this transaction and is incorporated into that document by reference herein.

The Buyers' Order referenced in this contract, which was also signed by the parties, identified the make, model and serial number of the vehicle being purchased and listed the base price, fees, and trade allowance for the vehicle. Neither the Purchase Spot Delivery Agreement nor the Installment Contract contain language which would incorporate the terms of one agreement into the other. The Pattons state in their joint affidavit that they did not read the Purchase Spot Delivery Agreement before signing it. They further state that no one from Wyler Eastgate advised them as to the form's purported intent. However, at her earlier deposition, Jennifer Patton had testified that she had read the Purchase Spot Deliver Agreement at least in part and that someone from Wyler Eastgate had attempted to explain it to her. (J. Patton Dep. at 23-32.)

After the parties had signed the relevant paperwork, Wyler Eastgate took the Pattons' 1989 Oldsmobile Cutlass in trade and delivered custody of the Ford Windstar to the Pattons. The Pattons were given a $1730.00 trade-in allowance for their Oldsmobile Cutlass as documented on the Buyers' Order and the Installment Contract.

More than one month after this transaction, on or about December 21, 2005, Wyler Eastgate contacted the Pattons to inform them that the Dealership had not been able to secure

financing for their purchase of the Windstar and to demand that the Pattons return the Windstar. Wyler Eastgate also told the Pattons that they had sold their Oldsmobile Cutlass. However, Wyler Eastgate was able to reclaim the Oldsmobile Cutlass and return it to the Pattons. Wyler Eastgate provides evidence that suggests that the Pattons had not provided complete and accurate information on their credit application.

The Pattons filed their Complaint in this action against Wyler Eastgate on January 11, 2006. Count I of the Complaint alleges violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and 12 C.F.R. 226.1 et seq. ("Regulation Z"). Count II of the Complaint alleges conversion and civil theft. The Pattons now move for summary judgment as to Count I. Wyler Eastgate opposes the motion. The Pattons' attorneys represented to the Court at the hearing held on March 1, 2007 that the Pattons wish to withdraw Count II of their Complaint. The Court will dismiss Count II of the Complaint based on Plaintiffs' representation at the March 1, 2007 hearing.

**II.     Standards Governing Motions for Summary Judgment**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party may support a motion for summary judgment with affidavits or other

proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. Pro. 56(e).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

**III.   ANALYSIS**

In Count I of their Complaint, the Pattons allege that Wyler Eastgate is liable for violations of TILA, including violations of Regulation Z, in connection with the financing disclosures stated in the Installment Contract.  In moving for summary judgment on the TILA claim, the Pattons must establish that Wyler Eastgate is a creditor for purposes of TILA and that it failed to provide the necessary TILA disclosures.  The Pattons do not attack the sufficiency of the TILA disclosures made on the face of the Installment Contract per se.  That is, the Pattons do not cite to any specific provision of the TILA statute or Regulation Z and identify a specific disclosure that Wyler Eastgate failed to make.  Rather, the Pattons allege that the facially valid disclosures made in the Installment Contract were rendered meaningless and illusory by the Purchase Spot Delivery Agreement.

In opposing the Pattons' motion, Wyler Eastgate contends that it cannot be held liable

5

under TILA because it is not a creditor as that term is defined in TILA. Wyler Eastgate further contends that the use of Purchase Spot Delivery Agreement does not violate TILA because other federal courts have upheld the practice of "spot delivery" against TILA challenges.

### A. Is Wyler Eastgate a TILA Creditor?

The Court will begin by analyzing whether Wyler Eastgate was a creditor under TILA for purposes of the transaction at issue. TILA defines the term "creditor" as follows:

> The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f) (emphasis added). Despite the existence of this statutory definition, the Pattons make two non-definition related arguments why the Court should find that Wyler Eastgate is a TILA creditor.

First, the Pattons contend that the Official Commentary to Regulation Z proves that Wyler Eastgate is a creditor. The Official Commentary gives the following example as a entity which would qualify as a TILA creditor:

> An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for the immediate assignment of the obligation to the bank. The dealer and the purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction.

12 C.F.R. § 226 Suppl. I at paragraph 2(a)17(i). The Pattons contend that Wyler Eastgate is a creditor pursuant to this Official Commentary example because the Installment Contract at least facially made the Pattons' obligation payable to Wyler Eastgate. However, the statutory

6

definition of creditor set forth above has two separate requirements: (1) that the creditor be someone who regularly extends consumer credit and (2) that the creditor is someone to whom the debt is initially payable based on the face of the obligation. 15 U.S.C. § 1602(f). The Official Commentary cited by the Pattons appears to be concerned with the second requirement only and may not be dispositive here.

The Pattons also contend that Wyler Eastgate is a creditor under TILA because it identified itself as such. Both the TILA statute and Regulation Z require the creditor in a transaction to identify itself. The TILA statute states that the creditor in "each consumer credit transaction other than under an open end credit plan" must make a number of specific disclosures, including the "identity of the creditor required to make disclosure." 15 U.S.C. § 1638(a)(1). Likewise, Regulation Z requires that the creditor in a "closed-end credit" transaction disclose "the identity of the creditor making the disclosures." 12 C.F.R. § 226.18(a). The Pattons contend that Wyler Eastgate was a creditor for purposes of TILA in this transaction because it identified itself as the Creditor-Seller in the Installment Contract wherein it made the "Federal Truth-in-Lending Disclosures." As such, Wyler Eastgate appears facially to identify itself as the TILA creditor pursuant to 15 U.S.C. § 1638(a)(1) and 12 C.F.R. § 226.18(a). Nonetheless, TILA provides an explicit definition of the term "creditor" at 15 U.S.C. § 1602(f) and the mere fact that Wyler Eastgate identified itself as the creditor may not be sufficient to meet the two requirements of that statutory definition.[1]

---

[1] At least one Ohio court has held that a dealership is a creditor for purposes of TILA when, as is the case here, the retail installment contract listed the dealer as the "creditor-seller." See Cartier v. Brown Credit Lot, No. CVI 04-24578, 2005 WL 3867414, at *1-2 (Ohio Mun. Ct. Apr. 4, 2005).

In the end, the Court's inquiry into whether Wyler Eastgate is a creditor returns, as it should, to the statutory definition. The undisputed evidence demonstrates that Wyler Eastgate satisfies the second part of the statutory definition. By holding itself out on the Installment Contract as the Creditor-Seller to whom the Pattons as the Buyers were obligated to pay "the Amount Financed and the Finance Charge," Wyler Eastgate is the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(f).

Whether Wyler Eastgate satisfies the first part of the statutory definition–a person who "regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required"– requires further analysis. Wyler Eastgate employees testified as to their belief that the dealership does not regularly extend credit. Cecil Bolling, the finance manager at Wyler Eastgate, testified that the creditor is the "one[ ] lending the money" and that Wyler Eastgate is not a creditor because it is not "a financial institution" or a "lending institution." (Bolling Dep. at 41-42.) Terry Davis, the chief financial officer for the Jeff Wyler Automotive Family, testified that Wyler Eastgate does not "as a rule . . . finance its own retail sales." (Davis Dep. at 68.) He also testified that Wyler Eastgate is not licensed as a retail installment creditor by the State of Ohio. (Davis Dep. at 51.) Finally, he testified that although Wyler Eastgate uses a retail installment sales contract in every financing transaction, it uses different forms depending upon which lending institution the dealership intends to finance

the sales transaction. (Id. at 11, 25-26.)[2]

On the other hand, Davis testified that Wyler Eastgate was required to comply with TILA. (Id. at 26.) He admitted that Wyler Eastgate had a financial interest in the retail sales installment contracts that it assigned, or sold, to third-party lenders. (Id. at 35.)

The Pattons do not refute any testimony offered by the Wyler Eastgate employees. Therefore, the evidence demonstrates that Wyler Eastgate does not consider itself a lending institution and does not regularly provide the ultimate financing for the vehicle transactions. The fact that Wyler Eastgate, however, requires all buyers to sign a retail installment sales contract for each financing transaction is significant. The Installment Contract signed by the Pattons expressly lists Wyler Eastgate as the creditor. It states that the Pattons, as buyers, were required to make 60 monthly payments to Wyler Eastgate, the creditor, in the sum of $493.93, which included a finance charge. Until that Installment Contract was assigned or cancelled in a contractual manner, Wyler Eastgate was the entity obligated to provide financing to the Pattons on the terms provided for their purchase of the Windstar. Stated differently, Wyler Eastgate was extending consumer credit to the Pattons by the terms of the Installment Contract both parties signed.

Additionally, Wyler Eastgate regularly extended credit by use of this type of retail installment sales contract with other customers. Wyler Eastgate averaged 390 retail sales a month in 2005, counting both new and used cars. (Davis Dep. at 11-12.) Sixty to seventy

---

[2] Wyler Eastgate does not do a "spot delivery" of the vehicle until they get a "payment call" from a lending institution giving preliminary approval for a payment and rate, and that also might add stipulations or conditions for the financing to be finalized. (Id. at 12-14.). Every retail customer who has a financing deal has to sign a purchase spot delivery agreement. (Id. at 48.)

9

percent of the 390 monthly sales were financing transactions. (Id. at 12.) Wyler Eastgate provided the Court with copies of all the retail installment sales contract forms that it used about the time of the Pattons' transaction. The dealership is identified on a significant number of the forms as the "seller" and/or "creditor" to whom installment payments, including finance charges, are due. The TILA disclosures are stated on each of the forms which are then to be signed by the dealership. Moreover, Wyler Eastgate's attorney represented to the Court that the exact form utilized in the Pattons' transaction is used in the majority of financing transactions. Thus, by the terms of the contract forms, Wyler Eastgate regularly extends credit to its customers to finance their vehicle purchases, at least for such limited time period until the contracts can be validly assigned to a third-party lender. The Court concludes that Wyler Eastgate meets the statutory definition of a TILA creditor stated at 15 U.S.C. § 1602(f) as a matter of law.

**B.      Did Wyler Eastgate Violate TILA by the Use of the Purchase Spot Delivery Agreement?**

The Pattons contend that Wyler Eastgate violated TILA because the Purchase Spot Delivery Agreement rendered the TILA disclosures on the Installment Contract illusory. There can be little debate that, taken alone, the Installment Contract is a fully integrated contract that purports to be binding on both parties when signed. The Purchase Spot Delivery Agreement purports to give the dealership alone the power to rescind the contract if it does not secure third-party financing or cannot assign the signed Installment Contract. Wyler Eastgate argues that the spot delivery practice is valid and that it has not violated TILA on the authority of other federal cases that have upheld the spot delivery practice. It contends that the key fact is that the TILA disclosures on the Installment Contract were valid when made because the Pattons were not obligated to purchase the vehicle on any financing terms other than those stated in the contract.

In Gill v. Byers Chevrolet LLC, No. C2:05-CV-982, 2006 WL 2460872 (S.D. Ohio Aug. 12, 2006), a court in this District examined the practice of spot delivery. The plaintiff in Gill signed a retail installment contract providing him with 5.9% interest rate financing. Id. at *1. The plaintiff stated that the dealership told him that it had secured the 5.9% rate from Citizen Automotive Finance. The plaintiff also stated that the dealership required him to sign a spot delivery agreement, and when he questioned why it was necessary if the financing already had been secured, the dealership told him it was "just a formality." Id. Approximately one month later, Byers Chevrolet asked him to return to the dealership to correct a typo on the sales agreement. Id. at *2. When he returned to the dealership, he was told that his financing had been rejected and that Byers Chevrolet found an alternative lender who would only provide financing at a higher 10.95% interest rate. Id. Gill signed a new installment contract at the higher rate, and then filed suit against Byers Chevrolet.

The district court dismissed Gill's TILA claims. It cited a provision of TILA, 15 U.S.C. § 1634, which provides as follows:

> If information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part.

Id. at *7. The court stated its understanding that Gill was not alleging a mere change of contract terms via a condition subsequent, but instead alleged that Byers Chevrolet lured him with a low interest offer that it did not intend to finance, only to switch him to a higher financing rate. But the court, in reliance on decisions by the Fifth and Seventh Circuits, held that this type of intentional "bait-and-switch" or spot delivery practice did not violate TILA. Id. at *8 (citing Clark v. Troy and Nichols, Inc., 864 F.2d 1261, 1264 (5th Cir. 1989) and Janikowski v. Lynch

Ford, Inc., 210 F.3d 765, 769 (7th Cir. 2000)).

This Court has reviewed the Fifth and Seventh Circuit cases. The Clark case from the Fifth Circuit is not particularly instructive because it speaks of "bait-and-switch" tactics in broad terms and the facts are materially distinguishable because the case does not involve an automotive financing situation. The Janikowski case is more on point. The plaintiff in Janikowski alleged a TILA violation after a dealership disclosed a 5.9% APR rate on a first installment contract, but later induced her to sign a second installment contract with a 11.9% APR rate by telling her that it could not arrange financing at the lower rate. 210 F.3d at 766. The court found that the dealership in Janikowski had not violated TILA because when the plaintiff signed the first installment contract, she had been obligated only for disclosed 5.9% APR rate. Id. at 767. The court then found that the first contract was "canceled" the next day when 5.9% financing was denied. The court concluded this portion of its analysis by stating that the second installment contract the plaintiff signed also was valid because it properly disclosed the 11.9% rate. Id. Finally, the court rejected the plaintiff's more general argument that the practice of "spot delivery" violated TILA because it found that the dealership had made truthful disclosures for the reasons stated above. Id. at 769.

There is at least one significant factual difference between the Pattons' transaction and the plaintiff's in Janikowski. The purchase order the Janikowski plaintiff signed stated that either the dealership or the plaintiff could cancel the retail installment contract if financing could not be obtained in five days. Id. The Pattons' Installment Contract purported to be binding upon the Pattons when it was signed.

More importantly, the court in Janikowski does not appear to have considered the

12

specific argument made by the Pattons here. The Pattons' argument is that the Installment Contract disclosures were rendered illusory by the Purchase Spot Delivery Agreement. The Janikowski decision does not set forth the exact terms of the retail installment contract signed by the plaintiff there. The Installment Contract here is a fully integrated contract that by its own terms was binding upon the parties, with the Pattons as Buyers and the Wyler Dealership as the Creditor-Seller, at the time it was signed. There is no language in the Installment Contract making it contingent upon approval by or assignment to a third-party financier. Even if the facts ultimately demonstrate that Wyler Dealership representatives verbally told the Pattons that the transaction was contingent upon the dealership's securing third-party financing, the Installment Contract states specifically that "oral changes are not binding." Instead, by the Installment Contract's terms, the Pattons were obligated to make 60 monthly payments to the Wyler Dealership for the purchase of the Windstar.

The Purchase Spot Delivery Agreement purports to give only the dealership the authority to cancel the Installment Contract. The language in the Purchase Spot Delivery Agreement that "financing for your purchase has not been finalized" directly contradicts the terms of the Retail Installment Sales Contract wherein the TILA financing terms are disclosed and Wyler Eastgate is identified as the Creditor-Seller to whom payments are due. The Installment Contract provides notice to the Pattons that Wyler Eastgate as the Seller "may assign this contract," but it does not make the validity of the Installment Contract contingent upon assignment. By contrast, the Purchase Spot Delivery Agreement purports to give the dealership the authority to reclaim the purchased vehicle if the Installment Contract is not assigned to or the financing approved by a third party. The representation in the Installment Contract that Wyler Eastgate is providing

13

credit on the financing terms stated in the TILA disclosures section for the Pattons' purchase is rendered meaningless by the language in the Purchase Spot Delivery Agreement permitting the dealership, in essence, to cancel the purchase. To the extent that the Janikowski or Gill courts implicitly found that the purchase order forms validly trumped the terms of the retail installment contracts without violating TILA, this Court respectfully must disagree.

The Court is aware of the general contract interpretation rule in Ohio that "a court may construe multiple documents together if they concern the same transaction." Center Ridge Ganley, Inc. v. Stinn, 31 Ohio St.3d 310, 314, 511 N.E.2d 106 (1987); see also Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 78 Ohio St.3d 353, 361-362, 678 N.E.2d 519 (1997) (stating that "a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." ). Special considerations militate against the application of the general rule in this instance. First, the Installment Contract signed by the Pattons contains a merger clause and purports to "contain[] the entire agreement between you and us relating to this contract." The Installment Contract does not reference or incorporate the other documents signed by the Pattons on November 10, 2005. Second, the terms in the Installment Contract and the Purchase Spot Delivery Agreement are materially inconsistent as discussed in the preceding paragraph. The inconsistencies make it impossible to reconcile the two contractual documents and read them as a coherent single contract. Finally, the Court is mindful of the purpose of TILA to promote the informed use of credit by assuring meaningful disclosures and protecting against fraud, a purpose that requires TILA to be considered liberally in favor of the consumer. See Baker v. Sunny Chevrolet, Inc., 349 F.3d 862, 864 (6th Cir. 2003); Jones v. Trans Ohio Sav.

Ass'n, 747 F.2d 1037, 1040 (6th Cir. 1984). The purpose of TILA would be frustrated if automobile dealerships are permitted to rescind the terms of integrated automobile retail installment sales contracts by use of a second, contradictory form.

Accordingly, the Court holds that Wyler Eastgate violated TILA by use of the Purchase Spot Delivery Agreement to vitiate the terms of the Installment Contract.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment on Liability (doc. 17) as to Count I in the Complaint is **GRANTED** and Count II of the Complaint is **DISMISSED**.

IT IS SO ORDERED.

                                                    s/Susan J. Dlott
                                                    Susan J. Dlott
                                                    United States District Judge